# LAW OFFICES OF LUIS A. PEREZ, P.A.

9500 S. Dadeland Boulevard, Suite 702 Miami, FL 33156

Lap@perezlaw.net

Office 305-577-0063

Telefax 305-577-4445

June 11, 2025

*Via E-mail: Fit.naviestere@cisl.it*

Remo Di Fiore
FIT – CISL Seafarers Sector
Via Antonio Musa, 4
00161 – Rome, Italy

**Re:** **Seafarer's Request For Arbitration (Statement of Claim)**
   **Elmer Marin v. Magical Cruise Company, Ltd., d/b/a Disney Cruise Line**
   **Our Client/Claimant:**   **Elmer Marin**
   **Respondent:**   **Magical Cruise Company, Ltd., d/b/a Disney Cruise Line**

Dear Mr. Di Fiore:

I represent the seafarer in this matter, Elmer Marin, a former 10-year employee of Disney Cruise Line, who was last working as a "Stateroom Host" aboard the *Disney Wonder*. On behalf of Mr. Marin, I have enclosed a "Seafarer's Request For Arbitration" for the claim which Mr. Marin is bringing against his former employer, Magical Cruise Company, Ltd., d/b/a Disney Cruise Line for an incident that occurred on February 18, 2020. I have sent a copy of the enclosed "Seafarer's Request For Arbitration" to Respondent.

Should you have any questions or need any further information, please feel free to contact me. My e-mail address for your convenience is lap@perezlaw.net.

Thank you.

Very truly yours,

Luis A. Perez

LAP/cc
Enclosures

cc:  disneytraveluk@disneyonline.com
   Disney Cruise Line – Human Resources Manager
   3 Queen Caroline Street
   Hammersmith, London, W6 9PE, England

**Exhibit A**

ELMER MARIN,

    Claimant,

vs.

MAGICAL CRUISE COMPANY, LIMITED
d/b/a DISNEY CRUISE LINE,

    Respondent.
_____/

## SEAFARER'S REQUEST FOR ARBITRATION
## (STATEMENT OF CLAIM)

Claimant, ELMER MARIN, requests arbitration in his claim against the Respondent, MAGICAL CRUISE COMPANY LIMITED, d/b/a DISNEY CRUISE LINE, and alleges:

### ALLEGATIONS APPLICABLE TO ALL COUNTS

1. This is a claim seeking monetary damages in the amount of $1 Million Dollars, and is brought under the purview of the "Jones Act", formerly 46 U.S.C. App. §688 and codified October 6, 2006 as 46 U.S.C. §30104, the general maritime law of the United States, and for breach of the shipowner's duty to maintain a seaworthy vessel and to provide Claimant with maintenance and cure.

2. Claimant, ELMER MARIN, was employed by Respondent as a seaman and as a member of the crew of the vessel "Disney Wonder," which vessel was owned, operated, managed, maintained and/or controlled by the Respondent.

3. Respondent, MAGICAL CRUISE COMPANY, LIMITED, d/b/a DISNEY CRUISE LINE, is a foreign corporation authorized to do business and doing business in Brevard County, Florida through Respondent's operation of cruise line vessels berthed in Port Canaveral, Brevard County, Florida. Respondent also operated, conducted, engaged in or carried on a business venture in the United States, particularly in Orlando, Florida, from which business the claims

herein alleged arose, and Respondent was engaged in substantial and not isolated business activity within the state of Florida and operated vessels in the waters of the United States and in Florida.

4. At all relevant times, the "Disney Wonder" was in navigable waters.

5. At all times material Claimant was employed as a "Stateroom Host" by the Respondent shipowner/operator.

6. At all times material hereto, Claimant, ELMER MARIN, was a Jones Act seaman who was entitled to all of the protections of the Jones Act as enumerated therein.

7. At all materials times, Respondent had a duty to provide Claimant with a safe place to work, and also had a non-delegable duty to provide Claimant with a seaworthy vessel on which to work, with maintenance and cure and with prompt and adequate medical care if Claimant was injured or became ill while in the service of the vessel.

8. At all material times during his employment and while in the service of the ship, Claimant performed all of the work required of him, and carried out all orders given by his superiors in a proper and appropriate fashion.

9. On or about February 18, 2020, Claimant was drugged, injured and became violently ill after he was served "Jamaican Coconut Bread" aboard the ship by another Disney crew member. Unbeknownst to Claimant, the "Jamaican Coconut Bread" had been tainted with drugs, Claimant consumed it and became violently ill with difficulty breathing, shortness of breath, blurry vision and other severe symptoms. Claimant required emergency medical treatment and overnight hospitalization onboard the ship, and to make a terrifying situation even worse, Disney thereafter shamed and humiliated Claimant by unjustifiably terminating him on February 23, 2020, ostensibly because he tested positive for the drugs which he had unknowingly consumed when

he ingested and was drugged with the tainted "Jamaican Coconut Bread."

10. Additionally, Disney failed to conduct a full and proper investigation of this incident, because even though a Disney crew member brought the "Jamaican Coconut Bread" aboard the ship from the Port of Falmouth, Jamaica, and two other crew members, and perhaps more, consumed the same bread, they were not tested and/or terminated. Claimant was a conscientious and dedicated employee of Disney Cruise Line for *ten (10) years* with an exemplary work record. He had no prior drug or alcohol problems and routinely passed all employment medical examinations and testing required by Respondent as a condition of his employment. In addition to becoming severely ill after being served drug contaminated food aboard the "Disney Wonder" by another crew member, Claimant was wrongfully terminated in breach of his employment contract and has suffered great harm to his reputation and future livelihood. Due to Disney's callous actions, Claimant is essentially permanently blacklisted from working with Disney Cruise Line or with any other cruise line again.

11. Claimant enjoyed his job with Disney Cruise Line and had planned to work well into the foreseeable future through retirement in order to continue providing for his young family. As a result of this permanent mark on his work record and Disney's actions, Claimant is no longer employable in the cruise line industry. He has also lost the wages that he was due to be paid pursuant to his employment contract through May 25, 2020. Claimant has suffered great shame, humiliation, mental anguish and depression as a result of this incident and was in need of professional mental health treatment, which Claimant requested but Respondent also failed and refused to provide. The Claimant was thereafter caused to suffer extreme emotional distress when Respondent wrongfully accused him of buying and/or consuming drugs, and calling the local police authorities to board the ship and interrogate the Claimant when the ship arrived in

the Port of New Orleans, Luisiana. The Claimant was subjected to an unwarranted, excruciating interrogation by the ship's security, his assistant security, and several police officers aboard the ship, followed by an intensive search of Claimant's cabin and personal belongings for drugs, all of which revealed *nothing*. Claimant was not charged or arrested for any crime, but as a result of the entire incident was caused to suffer great fear, severe emotional distress, humiliation, shock and mental anguish.

## COUNT I – JONES ACT NEGLIGENCE

Claimant readopts and re-alleges each and every allegation set forth in the foregoing paragraphs 1 through 11, as if stated herein verbatim, and further alleges:

12. Claimant was injured, became violently ill and suffered extensive damages which were all proximately caused by and resulted solely through the negligence of the Respondent (or its agents, servants or employees) and/or because of the unseaworthiness of the aforementioned vessel in that Respondent:

    (a) Failed to provide a reasonably safe work place by allowing their crew members to go ashore in foreign ports, and bring drugs and/or foreign food substances containing drugs to be brought back onto the ship.

    (b) Failed to supervise, inspect, or to conduct security searches of the crew members who were re-boarding the ship in Falmouth, Jamaica to prevent them from bringing aboard any drugs or other foreign food substances containing drugs back onto the ship.

    (c) Failed to have adequate security measures, supervision and monitoring of the crew gangway when crew members were re-boarding the ship after going ashore in Falmouth, Jamaica.

(d) Allowed drugs and/or foreign food substances to be brought back on the ship by crew members in foreign ports, and in particular in Falmouth, Jamaica, without adequate screening.

(e) Failed to provide shipboard safety rules and regulations to prohibit crew members from going ashore in foreign ports and bringing foreign food substances back aboard the ship.

(f) Failed to warn crew members not to purchase or bring foreign food substances back aboard the ship from certain vendors in foreign ports.

(g) Failed to conduct a full, thorough and proper investigation of the incident of February 18, 2020, causing Claimant to be wrongfully and falsely accused of "drug use", and wrongfully terminating him on February 23, 2020.

(h) Failed to search, or adequately search, the crew member who brought the "Jamaican Coconut Bread" back onto the ship in the Port of Falmouth, Jamaica where it could have been confiscated by the ship's security personnel in the crew gangway.

(i) Respondent negligently and wrongfully accused Claimant of taking drugs, while ignoring the facts and evidence that Claimant had unknowingly consumed drug contaminated food that was brought back into the ship by another crew member after purchasing it in the Port of Falmouth, Jamaica.

(j) Allowing Claimant to be intentionally or negligently drugged by another crew member who Respondent failed to search before allowing him back aboard the ship after going ashore in the Port of Falmouth, Jamaica.

(k) Respondent defamed Claimant, his reputation and character by wrongfully and falsely accusing Claimant of drug use.

**Law Offices of Luis A. Perez, P.A.**
9500 S. DADELAND BOULEVARD · SUITE 702 · MIAMI, FL 33156 · TEL. (305) 577-0063 · FAX (305) 577-4445 · E-MAIL: Lap@perezlaw.net

(l) Failed to properly evaluate the work place with the goal of providing Claimant with a safe place to work.

(m) Failed to eliminate the expected hazards or warn Claimant of the danger from the hazards of consuming food purchased ashore from certain vendors in foreign ports.

(n) Failed to correct all of the previously listed problems despite knowledge of the hazardous conditions that they created.

(o) Ignored conditions that existed for a sufficient length of time such that Respondent should have known of them.

(p) Failed to provide adequate security training, instruction, and supervision to Respondent's employees and crewmembers responsible for investigating the incident of February 18, 2020, to prevent the Claimant from being wrongfully accused of drug use, leading to his wrongful termination on February 23, 2020.

(q) Failed to provide medical attention to Claimant in breach of Respondent's maintenance and cure obligations after he was signed off the ship and sent home on February 23, 2020.

(r) Failed to provide prompt, adequate and timely medical care which aggravated Claimant's injuries, his mental health, prolonged his recovery and caused him additional pain and suffering and disability. After the Claimant's incident Claimant sought medical attention from the Respondent which Respondent refused to provide or pay for.

13. As a direct and proximate result of the negligence of the Respondent, the Claimant was injured, suffered physical pain, mental anguish, loss of enjoyment of life, disability, disfigurement, aggravation of previously existing conditions, incurred medical expenses in the care and

treatment of his injuries, suffered physical handicap, lost wages and his working ability has been impaired. The injuries are permanent or continuing in nature, and Claimant will suffer losses and impairments in the future.

**WHEREFORE**, the Claimant demands an award against Respondent for all damages allowed by law, costs and interest, and such other recovery as may be permitted by law.

## COUNT II - UNSEAWORTHINESS

Claimant readopts and re-alleges each and every allegation set forth in the foregoing paragraphs 1 through 13 above as if stated herein verbatim, and further alleges that:

14. Claimant's incident, his consequent injuries and damages were proximately caused by the unseaworthiness of Respondent's vessel in some or all of, but not limited to, the following respects:

    (a) The vessel was not reasonably fit for its intended purpose.

    (b) The crew of the vessel was not fit, in that the crew member who gave the drug contaminated "Jamaican Coconut Bread" to Claimant, was not equal in temperament, disposition and seamanship to ordinary men in the calling, and had vicious, evil, and belligerent propensities.

    (c) The vessel was unsafe and unfit due to the conditions created by Respondent's conduct previously described in paragraph number thirteen above.

    (d) The ship's security crew, personnel and human resource management were not properly trained, instructed or supervised in the performance of their duties.

    (e) Respondent failed to provide an adequate security force, personnel or system aboard the vessel.

    (f) The vessel failed to provide adequate safety and security measures to crew members and Claimant to prevent the incident, and its' aftermath, from occurring.

15. As a proximate result of the unseaworthiness of the vessel, Claimant has been damaged as aforesaid. As a direct and proximate result of the unseaworthiness of the vessel, the Claimant was injured, suffered physical pain, mental anguish, loss of enjoyment of life, disability, disfigurement, aggravation of previously existing conditions, incurred medical expenses in the care and treatment of his injuries, suffered physical handicap, lost wages and his working ability has been impaired. The injuries are permanent or continuing in nature, and Claimant will suffer losses and impairments in the future.

**WHEREFORE**, the Claimant demands an award against Respondent for all damages allowed by law, plus costs and interest, and such other recovery as may be permitted by law.

## COUNT III – FAILURE TO PROVIDE MAINTENANCE AND CURE

The Claimant, ELMER MARIN, readopts and re-alleges each and every allegation set forth in the foregoing paragraphs 1 through 15 above as if stated herein verbatim, and further alleges that:

16. On or about the previously stated dates, Claimant, while in the service of the vessel as a crewmember was injured and in need of maintenance and cure after he was signed off the ship on February 23, 2020. "Maintenance" is the Respondent's legal obligation to provide room and board, including food and a daily allowance for necessary incidentals; "cure" means medical care.

17. Under the General Maritime Law, Claimant, as an injured seaman, was entitled to receive maintenance and cure benefits from Respondent, until he was declared to have reached maximum medical improvement. This includes Claimant's unearned wages, (regular wages, overtime and vacation pay) which were reasonably anticipated under and through the end of the employment contract or voyage, whichever is longer.

18. The Claimant requested medical attention, and his maintenance and cure benefits subsequent to

the incident aboard the vessel, but Respondent arbitrarily, willfully and callously failed and refused to provide Claimant with any maintenance and cure, which aggravated Claimant's condition, caused him mental anguish, prolonged his pain and suffering and lengthened the time required for Claimant to reach maximum medical improvement.

19. Respondent's failure to provide Claimant with maintenance and cure and unearned wages occurred in whole or in part in Brevard County, Florida.

20. Respondent's failure and/or refusal to provide maintenance and cure to Claimant, its failure to furnish, authorize, and / or pay for Claimant's medical attention, and its failure to investigate or laxness in investigating Claimant's need for further medical attention, caused an aggravation of Claimant's condition, prolonged and caused him mental anguish, additional pain and suffering, and lengthened the time required for Claimant to reach maximum medical improvement.

21. After Respondent was informed of the Claimant's need for medical attention subsequent to the incident aboard the ship, Respondent knew or should have known that the Claimant was in need of further medical care, attention and shoreside treatment yet Respondent arbitrarily and willfully failed to investigate, authorize, and pay for the medical care, failed to provide and / or authorize medical attention, and his maintenance and cure benefits, which caused the continuing aggravation of Claimant's condition, exacerbated, prolonged and caused him mental anguish, additional pain and suffering, and further lengthened the time required for Claimant to reach maximum medical improvement.

22. Respondent's willful, arbitrary, capricious and callous disregard for Claimant's health and well-being and his need for further medical care forced Claimant to obtain the assistance of a lawyer in order to obtain his right to receive maintenance and cure from Respondent, which has obligated the Claimant to pay the undersigned a reasonable attorney's fee.

23. Respondent's arbitrary and willful failure and/or refusal to pay maintenance and cure, and provide medical attention to Claimant subsequent to the incident aboard the ship, and its failure to provide for Claimant's maintenance and cure has been willful, arbitrary, capricious, and in callous disregard for Claimant's rights as an injured seaman.

**WHEREFORE**, Claimant demands an award against Respondent for compensatory and punitive damages, plus attorney's fees, past and future maintenance and cure, costs and interest, and such other recovery as may be permitted by law.

### COUNT IV – WAGES AND PENALTIES PURSUANT TO 46 U.S.C. § 10313

Claimant readopts and re-alleges each and every allegation set forth in the foregoing paragraphs 1 through 23 above as if stated herein verbatim, and further alleges that:

24. At all times material hereto, Claimant was employed as a seaman in the service of Respondent's vessel.

25. While in the service of the ship, Claimant performed all of the work required of him, and carried out the orders given by his superiors.

26. Claimant was discharged on or about February 23, 2020, without any just or sufficient cause.

27. At the time of Claimant's discharge, Respondent did not pay Claimant all of his earned wages, including reimbursement of deductions previously made from Claimant's wages. Respondent has sole custody and control of Claimant's wage records and personnel file. These documents were previously requested and are needed by Claimant to review, but Respondent failed and refused to provide them. These documents and Claimant's personnel file will show the exact dates and amounts with respect to earned wages owing to Claimant and deductions made from such earned wages.

28. At the time of Claimant's discharge, Claimant demanded all his wages, including reimbursement

of deductions made from Claimant's earned wages.

29. Respondent refused to pay Claimant all his earned wages or reimburse Claimant for the deductions made there from, without sufficient cause.

30. Under 46 U.S.C.A. § 10313, Claimant is entitled to his earned wages, deductions and two days wages for each day payment is delayed.

**WHEREFORE**, Claimant demands an award for all damages he is entitled to by law, attorney's fees, prejudgment and post-judgment interest and costs.

## COUNT V – BREACH OF CONTRACT

Claimant readopts and re-alleges each and every allegation set forth in the foregoing paragraphs 1 through 30 above as if stated herein verbatim, and further alleges that:

31. Respondent's wrongful termination of the Claimant on or about February 23, 2020, was in breach of the Claimant's employment contract.

32. The Claimant had joined the ship "Disney Wonder" pursuant to an employment contract from January 2, 2020 to May 25, 2020 (copy attached as Exhibit "A").

33. Although the Claimant still had an employment contract, without cause or justification, the Respondent wrongfully and arbitrarily terminated the Claimant in breach of his employment contract on or about February 23, 2020.

34. As a direct and proximate result of the Respondent's breach of the Claimant's employment contract, the Claimant suffered the loss of the wages and benefits that he would have earned through the end of his contract, and his future employment, including the monetary value of free room and board, free medical care, vacation pay and other benefits, including full retirement benefits. Claimant has suffered lost earnings, diminished earning capacity, and lost time from work in the past and will suffer such losses in the future.

35. The Claimant has been forced to hire a lawyer to pursue his remedies and is obligated to pay attorney's fees and costs.

**WHEREFORE**, Claimant demands an award against Respondent for compensatory damages, attorney's fees, costs and interest, and such other recovery as may be permitted by law.

### COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Claimant readopts and re-alleges each and every allegation set forth in the foregoing paragraphs 1 through 35 above as if stated herein verbatim, and further alleges that:

36. At all times material hereto, the Claimant was wrongfully and recklessly accused of taking or keeping drugs onboard the ship, he was treated as a common criminal aboard the ship, subjected to a long and excruciating interrogation in the ship's security office with the ship's chief security officer, the assistant security officer and several police officers, subjected to an intensive search of his cabin and personal belongings, he was berated, threatened, harassed and humiliated and then without just cause, terminated and taken off the ship.

37. Respondent's conduct was intentional or reckless, that is, it intended its behavior when it knew or should have known that emotional distress would likely result from its' actions.

38. Respondent's conduct was so outrageous as to go beyond all bounds of decency and to be regarded as abhorrent and utterly intolerable in a civilized community.

39. Claimant has and will continue to suffer emotional distress and mental anguish as a result of Respondent's intentionally callous conduct which was so severe as to cause Claimant's mental anguish.

**WHEREFORE**, the Claimant demands an award for all damages recoverable under the law against the Respondent, including compensatory and punitive damages, costs, including attorney's fees and other damages and relief as allowed by law based on the intentional nature of Respondent's conduct, and for

any other relief which the arbitrator determines reasonable and just.

                                               Respectfully submitted,

                                               LAW OFFICES OF LUIS A. PEREZ, P.A.
                                               Attorney for Claimant
                                               9500 S. Dadeland Boulevard, Suite 702
                                               Miami, FL 33156
                                               T: (305) 577-0063
                                               F: (305) 577-4445
                                               E: lap@perezlaw.net

                                        By:  /s/ Luis A. Perez
                                                  Luis A. Perez, Esq.
                                                  FL Bar No. 0936870

Dated:   June 11, 2025

Elmer Dario Marin Martinez
00517753
PR-DCL-WHTHK

# CREW CONTRACT

THIS CREW CONTRACT ("Contract") is made and entered into between **Magical Cruise Company, Limited**, doing business as "Disney Cruise Line" ("**DCL**"), whose mailing address is P.O. Box 10210, Lake Buena Vista, Florida 32830, and the undersigned Crew Member ("**Crew Member**") based upon the representations and information provided by Crew Member in his or her Employment Application (which Employment Application is incorporated herein by reference) and provided by Crew Member's manning contractor.

1. EMPLOYMENT.
(a)   Crew Member shall be employed by DCL for a term not to exceed the Maximum Employment Period commencing on the earlier of the date Crew Member signs on the Vessel at the Port of Embarkation or the Report Date, all as specified and defined in Schedule A which is attached to and made a part of this Contract. The term "Schedule A" as used in this Contract means the Schedule A originally attached to and made a part of this Contract, as well as all Schedule A's that are subsequently incorporated into this Contract by mutual agreement of the Crew Member and DCL.
(b)   There will be breaks in this Contract during which Crew Member will not be employed by DCL on board the Vessel ("Off Contract Periods"). During these Off Contract Periods this Contract shall be suspended and shall be of no effect, and the Crew Member shall not be in the service of, or subject to the call of, the Vessel. Benefits provided under contracts with third parties described on Schedule B shall remain in effect during the Off Contract Periods; however, Maintenance and Cure and the Accidental Death Benefit <u>shall not</u> remain in effect during the Off Contract Periods. The date Crew Member signs off the Vessel at the beginning of an Off Contract Period shall be the effective date of suspension of this Contract, and the date Crew Member signs back on the Vessel at the end of an Off Contract Period shall be the effective date of reinstatement of this Contract. The specific start and end dates of the Off Contract Periods will be determined by DCL in its sole discretion; however, in no event shall the Crew Member be employed by DCL on board the Vessel during any single employment period in excess of two hundred sixty (260) days. DCL has no obligation whatsoever to employ Crew Member for a period in excess of the Maximum Employment Period specified in Schedule A, and nothing contained in this Contract shall be construed to require DCL to employ Crew Member for a period in excess of the Maximum Employment Period specified in Schedule A.

2. POSITION.  Crew Member shall be employed in the position specified in Schedule A aboard the Vessel, or such other cruise ship operated by DCL or one of DCL's affiliated companies as may be designated by DCL in DCL's sole discretion (the term "Vessel" as used in this Contract shall include any such other cruise ship). Crew Member shall personally and diligently perform such services as DCL may reasonably require, including any duties and services indicated on Schedule A.

3. COMPENSATION.
(a)   In full consideration of all rights and services provided by Crew Member, DCL will pay Crew Member the compensation specified in Schedule A.
(b)   DCL shall provide medical treatment to Crew Member during the term of Crew Member's employment in accordance with DCL's prevailing policies and applicable law. During any period of disability during which Crew Member is unable to perform the services required under this Contract, Crew Member's compensation hereunder shall be payable in accordance with DCL's prevailing policies and applicable law. In the event of Crew member's death during the term of Crew Member's employment, DCL shall only be obligated to pay Crew Member's estate or legal representative the compensation provided for herein to the extent earned by Crew Member prior to such event, as well as any benefits payable pursuant to Schedule B.
(c)   A summary of the privileges and benefits for which Crew Member is eligible is set forth in Schedule B attached to and made a part of this Contract, which privileges and benefits, and Crew Member's eligibility therefor, may be modified or amended by DCL from time to time in DCL's sole discretion.

4. COSTUMES.  DCL will provide costumes ("Costumes") and cleaning of Costumes at DCL's expense. Crew Member shall wear the Costumes at all times while on duty aboard the Vessel and shall return the Costumes to DCL in good condition (normal wear and tear excepted) upon signing off the Vessel. In the event Crew Member does not return the Costumes to DCL upon signing off the Vessel, the Crew Member shall pay to DCL the replacement value of the Costumes.

5. TRAVEL EXPENSES.  DCL will arrange and pay for all travel specified in Schedule A; provided, that the routes and modes of travel, and all other aspects of such travel, shall be determined by DCL in its sole discretion. Charges for excess baggage levied by transportation providers, or any other expenses in connection with shipments of Crew Member's personal belongings shall be paid by Crew Member.

6. TERMINATION.
(a)   Either party may terminate this Contract at will and without cause upon thirty (30) days prior verbal or written notice. DCL may, in lieu of providing the notice required in this subsection, pay to Crew Member the Cash Compensation payable by DCL to Crew Member during the notice period.
(b)   DCL may terminate this Contract immediately for any good cause, including without limitation neglect of duties, unexcused absence, incompetence, insubordination, failure to comply with any rules, regulations, policies, guidelines or other standards issued by DCL, endangering the Vessel or its crew or guests, misconduct while aboard or away from the Vessel, violation of any criminal law, or breach of any provision of this Contract.

**Exhibit A**

DCL 000250

(c)  This Contract shall terminate in the event of Crew Member's death.
(d)  Termination of this Contract by either party shall act to terminate any future Crew Contract entered into between the parties as of the date of termination of this Contract.
(e)  If the Crew Member is terminated for serious or willful default of employment obligations, the Company shall not pay for the Crew Member's repatriation.

7.  VESSEL LOSS/DAMAGE.  If the Vessel is sold, laid up, arrested, or suffers a total or constructive total loss, or if the Vessel is otherwise not operational because of acts of God, war, rebellion, insurrection, terrorism, embargo, blockage, labor dispute or any other circumstances beyond the control of DCL, DCL shall have the option in its sole discretion either to terminate this Contract immediately upon payment of any compensation due in accordance with Section 3 above, or to transfer the Crew Member to another vessel operated by DCL or one of DCL's affiliated companies. Reasonable travel expenses in these cases shall be paid by DCL; provided, that the routes and modes of travel, and all other aspects of such travel, shall be determined by DCL in its sole discretion. In the event that Crew Member's personal effects are damaged or lost in connection with an accident, fire or other incident affecting the Vessel, DCL shall pay to Crew Member on account of such loss the reasonable replacement value of such personal effects, up to a maximum of Three Thousand Dollars ($3,000); otherwise, DCL shall have no liability whatsoever with respect to any damage or loss of Crew Member's personal effects. Crew Member must submit evidence satisfactory to DCL of the replacement value of such personal articles.

8.  MEDICAL AUTHORIZATION/EXAMINATIONS.
(a)  Crew Member hereby irrevocably authorizes all past, present and future health care providers to provide DCL any and all medical, mental and dental health information concerning Crew Member of any nature whatsoever and Crew Member agrees to sign any medical records disclosure authorization form requested by DCL or any health care provider relating to Crew Member's medical, mental and dental records.
(b)  Crew Member's employment hereunder is subject to and contingent upon: (i) Crew Member taking and passing a medical examination prior to Crew Member's commencement of employment and periodically thereafter as may be requested from time to time by DCL; (ii) Crew Member's medical history as contained in the health records which are subject to the attached Medical Release Authorization being acceptable to DCL in DCL's sole discretion. Medical examinations may include (but not necessarily be limited to) x-rays, blood tests, urine analysis, tests for sexually transmitted diseases, drug and alcohol tests and hernia examinations. DCL shall arrange and pay the reasonable cost of such medical examinations. By executing this Contract, Crew Member authorizes the release of the results of any such medical examinations by the physician or other professional to DCL.

9.  RULES, REGULATIONS, ETC.  Crew Member shall at all times comply with and be subject to the following rules, regulations, policies, guidelines and other standards as they may exist from time to time: (a) Ship's Articles; (b) all rules, regulations, policies, guidelines and other standards set forth in the DCL Employee Policy Manual and, (c) all other oral and written rules, regulations, policies, guidelines and other standards of DCL and of the Vessel.

10.  USE OF CREW MEMBER'S NAME/LIKENESS/VOICE.  Crew Member hereby grants to DCL, and any other person or entity that DCL may authorize, the right to photograph, film and/or record Crew Member and furthermore, Crew Member hereby grants to DCL and DCL's parent, related and affiliated companies and their respective successors, affiliates, licensees and assigns, forever and throughout the world, the right to use such photographs, film, images, tapings and/or recordings of Crew Member's likeness, voice and sound, as the case may be, in all media and in all forms, including without limitation, advertising, promotional materials, publicity, digitized images, broadcasts, videos, films, commercials, and merchandise without further compensation or any limitation whatsoever, and all rights, title, interest in copyrights therein shall be DCL's sole property, free from all claims by Crew Member or any person deriving any rights or interests from Crew Member.

11.  CREW MEMBER SUGGESTIONS.  Any proposals or suggestions Crew Member may make concerning guest satisfaction, working environment or otherwise relating to DCL (or any of its affiliated companies) shall be the sole property of DCL and Crew Member hereby assigns all rights, including copyright that Crew Member might have or may acquire therein to DCL. Crew Member understands and agrees that any such proposal or suggestion may not be used at all or may be used in any manner and for any purpose by DCL and/or its affiliated companies without any payment or other compensation being provided to Crew Member in connection with such proposals or suggestions. The terms of this section shall not affect Crew Member's obligations under the Confidentiality Agreement between Crew Member and The Walt Disney Company and Associated Companies.

12.  NOTICES.  Except as otherwise provided in this Contract, any notices which either party is required or may desire to give the other shall be in writing and given by delivering such notice as follows: To DCL: Personal delivery to the Vessel's Master or one of the Vessel's Steering Committee Members; or, via a globally-recognized overnight courier addressed to Disney Cruise Line, 210 Celebration Place, Celebration, Florida 34747, Attention: Human Resources. To Crew Member: By personal delivery to Crew Member aboard the Vessel; or, to the Crew Member's last known mailing address contained in DCL's records; or, to the attention of the Crew Member care of the manning contractor who submitted Crew Member for work with DCL. The date of mailing or the date of personal delivery of any such notice shall be deemed to be the date on which such notice is given.

13.  GENERAL PROVISIONS.
(a)  This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter of this Contract and supersedes any and all previous agreements between Crew Member and DCL (or between Crew Member and one of DCL's related or affiliated entities), whether written or oral, with respect to such subject matter. No amendment, modification or waiver of any provision of this Contract shall be binding against DCL unless set forth in a writing signed by an authorized officer of DCL

and delivered to Crew Member. No waiver by either party of any breach by the other party of any provision or condition of this Contract shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time. This Contract may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(b) This Contract shall be governed by and construed in accordance with the laws of The Bahamas without regard to the principles of conflicts of law thereof. Crew Member agrees to submit to the jurisdiction of the courts of The Bahamas in connection with any dispute between Crew Member and DCL.

(c) Nothing contained in this Contract shall be construed to require any act or omission contrary to applicable law and wherever there is any conflict between any provision of this Contract and any applicable statute, law, ordinance or regulation, the latter shall prevail, but in such event the provisions of this Contract affected shall be curtailed and limited only to the extent necessary to bring it within legal requirements.

(d) This Contract does not constitute a commitment of DCL with regard to Crew Member's employment, express or implied, other than to the extent expressly provided for in this Contract. Upon the expiration or termination of this Contract, Crew Member's employment with DCL shall cease, and neither DCL nor Crew Member shall have any obligation to the other with respect to continued employment.

(e) In the event that legal action is commenced in the state of Florida, it is agreed by and between Crew Member and DCL that all suits, claims, disputes and matters whatsoever arising under, arising out of, or relating to Crew Member's employment under this Contract shall be litigated in and before any court of competent jurisdiction located in Brevard County, Florida, U.S.A. or the United States District Court, Middle District of Florida, Orlando Division, to the exclusion of all courts located in any other county, circuit or district within the state of Florida.

### IMPORTANT NOTICE

BY SIGNING THIS CONTRACT, CREW MEMBER CONFIRMS THAT CREW MEMBER HAS READ, UNDERSTANDS AND ACCEPTS THE TERMS AND CONDITIONS OF EMPLOYMENT SET FORTH IN THIS CONTRACT. CREW MEMBER FURTHER CONFIRMS THAT CREW MEMBER UNDERSTANDS THAT THE TERMS AND CONDITIONS OF THIS CONTRACT AFFECT CREW MEMBER'S LEGAL RIGHTS AND THAT CREW MEMBER MAY CONSULT WITH LEGAL COUNSEL OR OTHER ADVISORS OF CREW MEMBER'S CHOICE BEFORE SIGNING THIS CONTRACT. BASED ON THESE UNDERSTANDINGS, DCL AND CREW MEMBER MUTUALLY AGREE AND HEREBY ENTER INTO THIS CONTRACT AS OF THE DATE OF CREW MEMBER'S SIGNATURE OF THIS CONTRACT.

CREW MEMBER:

Signature: _[signature]_

Name Printed: Elmer Marin

Date of Signature: 23 / 01 / 19

Place of Signature: Disney Wonder

Crew Member's Birthdate: 02 -05 -79

Crew Member's Birthplace: Honduras

[E Initial] Crew Member requests to be assigned additional overtime hours not to exceed a total work week of 91 hours. Additional overtime hours will be paid at the hourly rate specified in Schedule A.

MAGICAL CRUISE COMPANY, LIMITED
doing business as DISNEY CRUISE LINE

By: _Mary Ellen Windsor_
Mary Ellen Windsor

Title: Disney Cruise Line
Human Resources

## Schedule "A" To Crew Contract

**Name:** Elmer Dario Marin Martinez
**Maximum Employment Period:** 145 day(s); in no event to extend beyond May 25, 2020
**Vessel:** Disney Magic / Disney Wonder / Disney Dream / Disney Fantasy
**Total Number of Crew:** 990 - 1450
**Port of Embarkation:** Galveston, Texas
**Report Date/Effective Date:** January 2, 2020

**Position:** Stateroom Host/ess

| COMPENSATION | WEEKLY AMOUNT |
|---|---|
| **Guaranteed Weekly Basic Wage:** Based on a 44 hour work week and payable via gratuities every other week. DCL will compensate for deficiencies if the total cash compensation within 2 full 14-day payroll periods is less than $1,463.35. | 160.10 USD |
| **Guaranteed Weekly Overtime:** Based on 28 hours overtime per week, including overtime hours worked on Saturday, Sunday, and Holidays and payable via gratuities every other week. DCL will compensate for deficiencies if the total cash compensation within 2 full 14-day payroll periods is less than $1,463.35. | 127.21 USD |
| **Supplemental Weekly Overtime:** Based on 12 hours overtime per week and payable via gratuities every other week. DCL will compensate for deficiencies if the total cash compensation within 2 full 14-day payroll periods is less than $1,463.35. | 54.52 USD |
| **Leave Compensation:** Based on 4.5 days base wage per month and payable every other week. | 24.01 USD |

**Note:** Your payroll checks, excluding gratuities, will be in the amount of **26.00**

| **TOTAL GUARANTEED WEEKLY WAGE** | **365.84 USD** |
|---|---|

**Additional Overtime Work:** If Crew Member has requested to be assigned up to an additional 7 hours of overtime work per week, Crew Member agrees to work at the hourly rate of 4.20 USD if additional overtime work becomes available. Crew Member recognizes that DCL may not be able to fulfill any or all of Crew Member's requests for additional overtime.

**Travel to be Arranged and Paid by DCL:** Repatriation provided by DCL and new hire must provide joining ticket. All subsequent tickets provided by DCL. If the Crew Member is terminated for serious or willful default of employment obligations, the Company shall not pay for the Crew Member's repatriation.

This Schedule A replaces and supersedes all previous Schedule A's relating to Crew Member.

I understand and acknowledge that I am subject to the terms of the Collective Bargaining Agreement between the **FEDERAZIONE ITALIANA TRASPORTI-CISL-ITF INTERNATIONAL DEPARTMENT** Italy, an affiliate of the International Transportation Federation (ITF), and Magical Cruise Company, Limited. The Agreement is available for review in the shipboard Human Resources Office.

**Crew Member Signature:** _[signature]_
**Date of Signature:** 01 — 05 — 20

**By:** _[signature]_ Mary Ellen Windsor
**Title:** MAGICAL CRUISE COMPANY, LIMITED
doing business as DISNEY CRUISE LINE
Disney Cruise Line
Human Resources

© Disney 00517753 / 20060237 / PR-DCL-WHTHK / D784 / HN / 13.00 USD / Printed: 2019-11-20 09:11:42

DCL 000275

## Schedule "B" to Crew Contract - Summary of Benefits and Privileges

This is an overview of benefit programs for which Crew Member is eligible in accordance with applicable law, DCL policies and the terms of the currently valid Collective Bargaining Agreement between DCL and Federazione Italana Transporti – CISL – ITF International Department ("CBA"). See the plan document for each program for specific information relating to coverage and benefits. In the event of a conflict between the information provided below and the specific terms of any such benefit program, the terms of the specific benefit program shall control. In the event of a conflict between the information provided below and the specific terms of the CBA, the terms of the CBA shall control. DCL may modify or discontinue any of these benefits at any time without notice to the Crew Member.

### Basic Benefits
Maintenance, Cure and Sick Pay
- Crew Member will receive payments for subsistence/room and board if shoreside medical care is necessary, in accordance with applicable law, DCL policies, the terms of this Contract and the CBA.
- Crew Member will receive shipboard medical care, and if appropriate, shoreside medical care, in accordance with applicable law, DCL policies, the terms of this Contract and the CBA.
- Crew Member will receive sick pay in accordance with applicable law, DCL policies, terms of this Contract and the CBA.

Accidental Death Benefit
- As compensation for accidental death while in the service of the ship, Crew Member will be eligible for death benefits up to 75,000 USD plus an additional 17,500 USD for each dependent up to a total of four. Maximum benefit payable is 145,000 USD. Benefits will be paid to the estate of the deceased Crew Member.

### Supplemental Benefits Voluntary Gap Coverage (Available through MHG Associates)
- Crew Member may purchase GAP medical coverage through insurer for the periods in between contracts.

### Privileges
- Please refer to Crew Privileges Handbook.

### Travel
- Coach.

### Berthing
- Shared cabin.

CREW MEMBER'S CREW CONTRACT IS HEREBY AMENDED BY THIS SCHEDULE B, WHICH REPLACES AND SUPERSEDES ALL PREVIOUS SCHEDULE B's RELATING TO CREW MEMBER.

Crew Member Signature: _____

Date of Signature: 23 — 0r — 19

MAGICAL CRUISE COMPANY, LIMITED
doing business as DISNEY CRUISE LINE

By: Mary Ellen Windsor

Title: Disney Cruise Line
Human Resources

00517753  OLB/SPO/CNE/CE - SHARED

DCL 000254